FILED

2023 Apr-24  PM 02:21
U.S. DISTRICT COURT
N.D. OF ALABAMA

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| DONNA J. LOGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:21-cv-1612-GMB |
| | ) | |
| CITY OF MIDFIELD, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

Plaintiff Donna J. Logan filed a complaint against her employer, the City of Midfield, alleging discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(m). Doc. 1 at 3–4.  The parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). Doc. 15.  Before the court is the City's Motion for Summary Judgment. Doc. 24.  The motion has been fully briefed (Docs. 27, 30 & 33) and is ripe for decision.  The City's motion is due to be granted.

### I.  STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  "The purpose of summary judgment is to separate real, genuine issues from those which are formal or pretended." *Tippens v.*

*Celotex Corp.*, 805 F.2d 949, 953 (11th Cir. 1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view

all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Ed. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). On the other hand, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## II. BACKGROUND

On December 6, 2021, Logan filed a *pro se* complaint using the court's standard form for a complaint in a civil case. *See* Doc. 1. She alleged federal question jurisdiction and identified Title VII as the federal statute at issue. Doc. 1 at 3. Under the prompt on the form for her to "write a short and plain statement of the claim," Logan wrote, in full:

> I am a female police officer. I was promoted to the rank of Lieutenant. I was always called on by Mayor Gary Richardson to handle all types of tasks. Once Chief Jesse Bell was promoted I was not allowed to do my job. I was unable to supervise certain sergeants. A meeting was held with the Mayor, City Councilor James Reasor and the police department in July 2020. Everybody in this meeting was told that these practices would stop and to notify the Mayor if they continued. I called the Mayor the next week because nothing changed. The Mayor stated that he was tied up and he would call me back. Instead I got called into the Chief['s] office and was told "Yeah the Mayor said you wanted a meeting." I have not got the call back from the Mayor yet.
>
> I can not be compensated for handling business after hours.
>
> I am now being retaliated and my job duties are being changed.

Doc. 1 at 4. For her damages, Logan sought compensation "for all hours of handling City of Midfield's business[] while not at work," "damages in whatever amount set by the court and attorney fees," and "for the discriminating practices to stop." Doc. 1 at 5.

To her complaint, Logan attached a copy of her EEOC charge of discrimination, dismissal, and notice of rights. Doc. 1 at 6–12. According to these documents, she filed her charge of discrimination on August 23, 2021, and alleged discrimination based on race and gender in violation of Title VII. Doc. 1 at 6–7. She did not allege retaliation. Doc. 1 at 6. She claimed that the earliest act of discrimination occurred on November 1, 2019, and the latest on July 23, 2021, but also alleged a "continuing action." Doc. 1 at 6. Her EEOC charge fleshes out some of the facts alleged in the complaint:

4

> I am a black female.  I was hired in May 2006, as a Police Officer.  I currently hold the title of Lieutenant.  I am the only Lieutenant in the department.  In 2019, I complained that I was having trouble with supervising the white Police Officers.  In July 2020, Mayor Gary Richardson held a meeting to discuss the proper chain of command and encourage all who attended the meeting of his open-door policy.
>
> To date, the problem still exists.  I am still having trouble with the supervision of the white Police Officers.  They will go directly to Chief Jessie Bell (Black) and disregard my authority entirely.  My access to the pay system has been revoked by Chief Bell, and I am not allowed to know the code to access it.  The white Sergeants under my authority have the code to access the pay system and were told not to give it to me.  I have complained of the unfair treatment, but nothing has been done to correct it.

Doc. 1 at 6.  The EEOC issued a dismissal and notice of right to sue on September 7, 2021. Doc. 1 at 10.

Counsel appeared on Logan's behalf on June 1, 2022 (Doc. 12), but did not amend Logan's *pro se* complaint.

### III.  STATEMENT OF RELEVANT FACTS[1]

Within the City's police department, police officers report to sergeants, who in turn report to lieutenants. Doc. 25-1 at 35.  Lieutenants report to the Chief of Police and the Chief of Police reports to the City's mayor. Doc. 25-1 at 10 & 35. The Chief of Police handles the day-to-day operations of the police department. Doc. 25-2 at 13–14.

---

[1] Logan did not respond to the statement of undisputed facts in the City's brief in support of summary judgment.  As a result, the court relies heavily on the City's statement of facts in this opinion but performed an independent review of the record to determine whether genuine factual disputes exist. *See Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008).

When the City hired her in May 2006, Logan, a black woman, worked as a patrol officer and held the rank of sergeant. Doc. 25-1 at 6–7.  She received a promotion to lieutenant about 8 years ago. Doc. 25-1 at 7.  Since a car accident in 2015, Logan has been on restricted duty and unable to perform regular patrol duties. Doc. 25-1 at 8.  She instead has performed administrative duties, operated the red-light camera system, and "made out the work list for the officers and sergeants." Doc. 25-1 at 7.  In April 2022, Logan became a detective. Doc. 25-1 at 7 & 71.  In this position, she works cases, screens warrants, interviews witnesses and suspects, and goes out on calls. Doc. 25-1 at 7.  She also has performed dispatch duties, which she dislikes. Doc. 25-1 at 28–29.  Although her job duties have changed, Logan's rank has not changed and she has never received a pay cut, demotion, or been disciplined by the City. Doc. 25-1 at 7.

Logan is the only female police officer working for the City and one of approximately ten officers in the department. Doc. 25-2 at 8.  Jesse Bell, a black man, is the Chief of Police. Doc. 25-1 at 10.  There are also four male sergeants— Chris Grace and Michael Jeffries are white, and Kenneth Parham and Cordair Kelly are black. Doc. 25-1 at 10–12 & 14; Doc. 35-3 at 17.  Logan supervises all of the sergeants because she is the only lieutenant in the department. Doc. 25-1 at 11.  Her supervisory duties include answering questions and concerns as well as evaluating the sergeants' performance. Doc. 25-1 at 11.

### A.    Supervision Issues

Logan testified that she is unable to supervise the two white sergeants under her command. Doc. 25-1 at 15.  Beginning in April or May 2020, Sergeants Grace and Jeffries refused to report to her as required by the customary chain of command. Doc. 25-1 at 16–18.  Logan's testimony centers on Grace, and she admits that her working relationship with Jeffries has improved over time. Doc. 25-1 at 15 & 18. Specifically, she testified that Grace "won't do what I say, he don't treat me as being his supervisor, and it's like—if I tell him to do something, he is not going to do it and then he will go to Chief and then the Chief will not make him do it." Doc. 25-1 at 33.

For instance, when Logan makes the work schedule, Grace often asks Chief Bell to make changes for him instead of raising the issue with her.[2] Doc. 25-1 at 16. And Grace does not use the time clock because Bell gave him sign-on information allowing him to manually enter his time into the computer system. Doc. 25-1 at 17. Logan does not believe that Grace accurately reports his hours, but Bell revoked Logan's own access to the system about two years ago. Doc. 25-1 at 17 & 19.  Now only Chief Bell and Grace have access to it.[3] Doc. 25-1 at 19.  Logan does not see

---

[2] Logan makes the schedule and gives it to Bell for approval. Doc. 25-1 at 16.  Bell then approves it as submitted or makes changes. Doc. 25-1 at 16.
[3] Logan testified that Jeffries also had access to the time clock system at some point, but he does not now. Doc. 25-1 at 20.

the revocation of her access as a demotion—"he just took the privilege away."[4] Doc. 25-1 at 19.  There is no evidence that Logan ever complained to Bell about her access to the time system. *See* Doc. 25-3 at 19–20.

Logan reported these supervision issues to Bell and "[h]e didn't have an answer." Doc. 25-1 at 18.  She has not tried to discipline the sergeants because "[d]iscipline is not something that is done" at the City. Doc. 25-1 at 18.  Although she had the ability to write up the officers below her and put these reports in their personnel files, she did not do this "[b]ecause [she] didn't think that anything would happen with it." Doc. 25-1 at 19.  Logan has never been disciplined or received a negative performance evaluation related to her supervision of the officers under her. Doc. 25-1 at 38.  And since she has become a detective, Logan does not have many interactions with Grace, which has made her job easier. Doc. 25-1 at 38.

Because of unhappiness in the department caused primarily by Grace's behavior and attitude (Doc. 25-1 at 22), Logan "wanted a meeting with the Mayor" to let him "know what was going on within the police department." Doc. 25-1 at 23. Chief Bell set up a meeting in July 2020 with Mayor Richardson, City Councilman James Reasor, the chair of the City's Public Safety Committee, and the entire police department. Doc. 25-1 at 80; Doc. 25-2 at 15–16.  Mayor Richardson testified that there were two cliques in the police department, one supporting Chief Bell and the

---

[4] And, in fact, Logan testified that this was a duty she did not like to perform. Doc. 25-1 at 19.

other supporting Logan, and that he called the meeting to address this issue and the department's lack of productivity. Doc. 25-2 at 10–11.

At the meeting, Logan and several other officers complained about Grace. Doc. 25-1 at 23–24; Doc. 25-2 at 15; Doc. 25-3 at 15.  Logan spoke about the issues she encountered trying to supervise Grace and Jeffries and explained that Grace went over her head to Bell whenever she told him to do something he did not want to do. Doc. 25-1 at 24.  Mayor Richardson "reiterated that there should be respect for hierarchy—the chief, the lieutenant, the sergeants, and that chain of command must be respected." Doc. 25-2 at 11.  Richardson also provided the officers with his cell phone number, said he had an open-door policy, and invited the officers to contact him if they had problems. Doc. 25-1 at 24–25; Doc. 25-2 at 12.  No one made any complaints about any sort of discrimination during the meeting. Doc. 25-3 at 25.

The next week, Logan called Mayor Richardson and told him that she wanted to meet with him again "[b]ecause nothing had changed." Doc. 25-1 at 25.  He did not respond, and Logan did not try to get back in touch with him. Doc. 25-1 at 25.

## B.    Off-the-Clock Time

Logan "set[s] her own hours" and can clock in to work remotely. Doc. 25-1 at 8 & 71.  She receives compensation for overtime hours, but she is not paid when she receives a call at home after hours to handle a situation or because a citizen has a question. Doc. 25-1 at 25–27.  Bell told her that she "could not claim the time when

[she was] contacted at home handling city business," but she kept a record of these hours beginning on November 26, 2021. Doc. 25-1 at 26, 67 & 75.

Logan originally logged the date and time when she had to do extra work. Doc. 25-1 at 69.  After filing her lawsuit, she added "guesstimates" about the time it took her to complete the various tasks. Doc. 25-1 at 68–70 & 71–73.  Since Chief Bell told her not to submit the hours, she has not reported this time. Doc. 25-1 at 27. Other detectives were compensated for their off-the-clock time at one point, but later "[t]hey quit getting it." Doc. 25-1 at 27.

## IV.  DISCUSSION

Logan brings claims for race discrimination, gender discrimination, and retaliation in violation of Title VII against the City. Doc. 1.  The City moves for summary judgment on all claims, and summary judgment is due to be granted.

## A.    Failure to Exhaust Administrative Remedies

The starting point for defining the permissible scope of a judicial complaint alleging employment discrimination is the administrative charge and investigation. *Griffin v. Carlin*, 755 F.2d 1516, 1522 (11th Cir. 1985).  Before filing a Title VII action, "a plaintiff first must file a charge of discrimination with the EEOC." *Gregory v. Ga. Dep't of Hum. Res.*, 355 F.3d 1277, 1279 (11th Cir. 2004) (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 460 (5th Cir. 1970)).  "The purpose of this exhaustion requirement 'is that the [EEOC] should have the first opportunity

to investigate the alleged discriminatory practices to permit it to perform its role in obtaining voluntary compliance and promoting conciliation efforts.'" *Gregory*, 355 F.3d at 1279 (quoting *Evans v. U.S. Pipe & Foundry Co*., 696 F.2d 925, 929 (11th Cir. 1983)).  The Eleventh Circuit "has noted that judicial claims are allowed if they 'amplify, clarify, or more clearly focus' the allegations in the EEOC complaint, but has cautioned that allegations of new acts of discrimination are inappropriate." *Gregory*, 355 F.3d at 1279–80 (quoting *Wu v. Thomas*, 863 F.2d 1543, 1547 (11th Cir. 1989)).

"In light of the purpose of the EEOC exhaustion requirement," the Eleventh Circuit has held that "a 'plaintiff's judicial complaint is limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Gregory*, 355 F.3d at 1280 (quoting *Alexander v. Fulton County, Ga*., 207 F.3d 1303, 1332 (11th Cir. 2000)).  "Courts are nonetheless 'extremely reluctant to allow procedural technicalities to bar the claims brought under [Title VII].'" *Id.* at 1280 (quoting *Sanchez*, 431 F.2d at 460–61).  The Eleventh Circuit "has noted that 'the scope of an EEOC complaint should not be strictly interpreted.'" *Id.* at 1280 (quoting *Sanchez*, 431 F.2d at 465).  "To determine whether a plaintiff has exhausted her administrative remedies, then, the 'proper inquiry' is whether the '[plaintiff's] complaint is like or related to, or grew out of, the allegations contained in [the] EEOC charge.'" *Batson v. Salvation Army*, 897 F.3d 1320, 1328 (11th Cir.

2018) (quoting *Gregory*, 355 F.3d at 1280).

The City contends that Logan did not exhaust her claim for off-the-clock work. Doc. 27 at 33–34. The court agrees. The allegations in Logan's charge relate to her inability to supervise other officers, the meeting with Mayor Richardson, and her exclusion from the computerized pay system. Doc. 1 at 6. Nothing in her charge relates in any way to off-the-clock time worked from home after Chief Bell's instruction that the City would not compensate her for that time. This claim is not one that is like or related to the claims in her charge, and it is well outside of the scope of the EEOC's investigation of her claims. *See* Doc. 25-4. Logan does not argue otherwise. *See* Doc. 30 at 7–8.

Instead, Logan contends that it would have been futile for her to file an EEOC charge for her off-the-clock work. Doc. 30 at 7–8. She claims that because her "administrative remedy would have required reporting the work to the person assigning it, it is waived for the purposes of this action." Doc. 30 at 8. This argument is not persuasive. First, the case Logan cites for this proposition does not support a futility exception to the EEOC exhaustion requirement[5] and the court has not found any authority for such an exception. Second, as the City argues, a futility exception such as the one Logan proposes would effectively extinguish the exhaustion

---

[5] Instead, the caselaw acknowledges a futility exception to the ERISA exhaustion requirement. *See Perrino v. Southern Bell Tel. & Tel. Co.*, 209 F.3d 1309, 1318 (11th Cir. 2000).

requirement for employment claims involving decisions made by supervisors. This cannot be the law. Accordingly, the court finds that Logan failed to exhaust her claim that she was not paid for her off-the-clock work. That failure prohibits the court from reviewing this claim. *See Gregory*, 355 F.3d at 1279–80.

The City also argues that Logan's claim about the revocation of her access to the payroll system is untimely. "For a charge to be timely in Alabama, a non-deferral state, it must be filed within 180 days after the alleged unlawful employment practice occurred." *Reed v. Winn Dixie, Inc*., 667 F. App'x 607, 610 (11th Cir. 2017) (citing 42 U.S.C. § 2000e–5(e)(1)); *see also Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1214 n.2 (11th Cir. 2001) (distinguishing between deferral and non-deferral states). "Failure to file a timely charge with the EEOC generally results in a bar of the claims contained in the untimely charge." *Reed*, 677 F. App'x at 610 (citation omitted).

Logan testified that Chief Bell revoked her access to the payroll system in approximately October 2020.[6] *See* Doc. 25-1 at 19. Logan did not file her charge of discrimination until August 23, 2021 (Doc. 25-1 at 6), more than nine months later. She argues that "the 180-day period that would normally apply to a single discriminatory action is not applicable" because Bell's removal of her access to the

---

[6] Logan testified that Bell revoked her access two years before her deposition in October 2020. Doc. 25-1 at 19.

payroll system is a "continuing violation." Doc. 30 at 6–7.  Again, the court does not agree.

"Where an employee charges an employer with continuously maintaining an illegal employment practice, [s]he may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice." *Beavers v. Am. Cast Iron Pipe Co*., 975 F.2d 792, 796 (11th Cir. 1992) (quoting *Gonzalez v. Firestone Tire & Rubber Co.*, 610 F.2d 241, 249 (5th Cir. 1980)).  But "where the employer engaged in a discrete act of discrimination more than 180 days prior to the filing of a charge with the EEOC by the employee, allegations that the discriminatory act continues to adversely affect the employee or that the employer presently refuses to rectify its past violation" do not allow the employee to skirt the 180-day requirement. *Id*.; *see also Stewart v. Booker T. Wash. Ins*., 232 F.3d 844, 853 (11th Cir. 2000); *Ross v. Buckeye Cellulose Corp*., 980 F.2d 648, 658 (11th Cir. 1993).  "In determining whether a discriminatory employment practice constitutes a continuing violation, the Eleventh Circuit distinguishes between the present consequence of a [one-time] violation, which does not extend the limitations period, and the continuation of the violation into the present, which does." *Calloway v. Partners Nat'l Health Plans*, 986 F. 2d 446, 448 (11th Cir. 1993) (internal quotation marks omitted).

Logan's complaint that Chief Bell removed her access to the payroll system

is a discrete act.  Her continued lack of access does not somehow transform the alleged discriminatory act into a continuing violation.  Accordingly, the court finds that this claim would be untimely even if it had been exhausted.

**B.  Discrimination in Violation of Title VII**

The court now turns to the timely and exhausted claims presented in the complaint.  First, Logan contends that she suffered race and gender discrimination in her reassignment to dispatcher and detective duties and in her inability to supervise the sergeants under her.  Next, she contends that her job assignments were retaliatory.  Summary judgment is due to be granted on all claims.

Under Title VII, "it [is] unlawful for an employer 'to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" *Maynard v. Bd. of Regents*, 342 F.3d 1281, 1288 (11th Cir. 2003) (quoting 42 U.S.C. § 2000e–2(a)(1)).  Absent direct evidence of discrimination, a plaintiff may prove her case through circumstantial evidence using the framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1087 (11th Cir. 2004).  The plaintiff bears the initial burden of establishing a *prima facie* case of discrimination. *Id.*  After the *prima facie* case, the employer has the burden to articulate a legitimate, nondiscriminatory reason for the

employment decision. *Id*.  At this point, the burden shifts back to the plaintiff to show that the proffered reason was a pretext for illegal discrimination. *Id*.  Although the burden of production may shift, the ultimate burden of persuasion remains with the plaintiff. *E.E.O.C. v. Joe's Stone Crabs, Inc*., 296 F.3d 1265, 1272 (11th Cir. 2002).

The *McDonnell Douglas* framework is not the only way for a plaintiff to survive summary judgment in a discrimination case. *See Smith v. Lockheed–Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  "The plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id*.  A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a "convincing mosaic" of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker. *Id*.; *see generally Hamilton v. Southland Christian Sch., Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012).  Logan invokes both methods of proof.

### 1.   McDonnell Douglas *Framework*

To establish a *prima facie* case of discrimination, a plaintiff must show that (1) she is a member of a protected class, (2) she was subjected to an adverse employment action, (3) her employer treated similarly situated employees outside of her protected class more favorably, and (4) she was qualified to do the job. *See Joe's*

*Stone Crab, Inc.*, 220 F.3d at 1286; *see also Lewis v. City of Union City, Ga*., 918 F.3d 1213, 1218 (11th Cir. 2019) ("[A] meaningful comparator analysis must be conducted at the *prima facie* stage of *McDonnell Douglas*'s burden-shifting framework, and should not be moved to the pretext stage.").

The City argues that Logan cannot make out a *prima facie* case because none of the alleged discriminatory actions are "adverse employment actions." Doc. 27 at 21–24 & 28–30.  "An adverse employment action is not only an element of the *prima facie* case, but an element of the claim itself." *Holland v. Gee*, 677 F.3d 1047, 1056 (11th Cir. 2012).  To rise to the level of an adverse employment action, the Eleventh Circuit requires "a serious and material change in the terms, conditions, or privileges of employment." *Id*. (internal citation and emphasis omitted); *see also Jefferson v. Sewon Am., Inc*., 891 F.3d 911, 920–21 (11th Cir. 2018) ("An employee must establish an adverse employment action by proving that a decision of the employer impacted the terms, conditions, or privileges of her job in a real and demonstrable way") (citation, internal quotation marks, and alterations omitted).  "Generally, an adverse employment action requires a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *McCone v. Pitney Bowes, Inc*., 582 F. App'x 798, 800 (11th Cir. 2014) (citation omitted).  "The employee's subjective view of the significance and adversity of the employer's

action is not controlling." *Id.* (citing *Kidd v. Mando Am. Corp.*, 731 F.3d 1196, 1204 (11th Cir. 2012). "Rather, the employment action must be materially adverse as viewed by a reasonable person under the same circumstances." *Id.*; *see also Jefferson*, 891 F.3d at 921.

### a.    Work Assignments

Logan contends that her reassignments to dispatch and detective duties were adverse employment actions because the "roles represented active hardships for [her] as compared to her prior administrative role, as they both involve or potentially involve significant amounts of pain or discomfort due to [her] injury."[7] Doc. 30 at 2.  Logan admits that these assignments "might not be adverse to most individuals, [but] due to [her] particular circumstance, a reasonable employee in her position would have found the challenged action materially adverse." Doc. 30 at 2–3 (quotation marks and citation omitted).  The court disagrees.

First, Logan did not suffer any loss in pay or benefits or a change of classification or benefits.  She remained a lieutenant and continued to supervise the dispatchers and the sergeants.  In other words, there was not "a serious and material change in the terms, conditions, or privileges" of her employment. *Holland*, 677 F.3d at 1056.  In addition, Logan misunderstands the reasonable person standard.  The

---

[7] Logan does not have an ADA claim and did not request an accommodation.  Instead, she testified that she is able to perform her job duties. Doc. 25-1 at 29.

court must look at the circumstances of the adverse action from a reasonable person's perspective—not through the lens of Logan's particular circumstances or characteristics. *See Howard v. Walgreen Co.*, 605 F.3d 1239, 1245 (11th Cir. 2010) ("[T]he employee's subjective view of the significance and adversity of the employer's action is not controlling; the employment action must be materially adverse as viewed by a reasonable person in the circumstances."); *Davis*, 245 F.3d at 1239; *Jefferson*, 891 F.3d at 921; *Kidd*, 731 F.3d at 1203.

Moreover, the Eleventh Circuit "does not favor" work assignment claims. *Kidd*, 731 F.3d at 1203. Instead, "'[w]ork assignment claims strike at the very heart of an employer's business judgment and expertise because they challenge an employer's ability to allocate its assets in response to shifting and competing market priorities.'" *Id.* (quoting *Davis v. Town of Lake Park*, 245 F.3d 1232, 1244 (11th Cir. 2001), *overruled on other grounds by Burlington Northern v. White*, 548 U.S. 53 (2006). "Title VII is neither a general civility code nor a statute making actionable the ordinary tribulations of the workplace." *McCone*, 582 F. App'x at 800. "Indeed, Title VII was not designed to make federal courts second-guess the business judgment of employers." *Id.* For all of these reasons, Logan's change in work assignment does not amount to an adverse employment action.

### b. Supervision

Logan contends that the complications she experienced while supervising

Grace and Jefferies amount to an adverse employment action. Doc. 30 at 6.  She argues that the "inability to properly and adequately supervise 50% of one's employees is a serious and material change in the terms, conditions, and privileges of employment, as it by necessity limited Logan's authority and practical ability to accomplish her job goals by at least half." Doc. 30 at 6.

Other than the information in an affidavit Logan submitted in opposition to summary judgment (Doc. 31-1 at 3), there is no evidence that Grace's or Jeffries' behavior affected her ability to do her job.  And her affidavit testimony is wholly conclusory and does not provide any examples of how the alleged subordination negatively affected her ability to perform the core functions of her job. *See Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000) (holding that "conclusory allegations without specific supporting facts have no probative value").  Instead, the record shows that Logan performed her job well.  She never received any discipline or negative performance evaluations because of the sergeants' insubordination. Doc. 25-1 at 7 & 38.  Her pay and rank have never changed, and she has never been demoted. Doc. 25-1 at 7.  Ultimately, there is no evidence of any tangible, serious, and material change in the terms, conditions, or privileges of Logan's employment because of the relationship between her and any of her subordinates.  The evidence simply does not support her conclusory testimony.

In essence, the evidence establishes only that Logan did not like the way Grace

(and to some extent Jeffries) treated her.  "'Snubbing' by supervisors and co-workers does not qualify as a materially adverse employment action." *Hudson v. Fla. Dep't of Corr.*, 2017 WL 2903346, at *3 n.11 (N.D. Fla. May 12, 2017) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)); *see also Smith v. Ala. Dep't of Public Safety*, 64 F. Supp. 2d 1215, 1222 (M.D. Ala. 1999) (finding that "embarrassment" or a "bruised ego" from a transfer does not constitute adverse employment action).  For these reasons, Logan's inability to adequately supervise Grace and Jeffries does not amount to an adverse employment action.

### 2.    *Convincing Mosaic*

Logan argues that her disparate treatment claim survives summary judgment under the convincing mosaic standard because "she has submitted evidence that the actions taken by the Defendant and the position that Logan found herself in were a result of intentional discrimination." Doc. 30 at 3.  Logan does not, however, identify the evidence that meets the convincing mosaic standard.  She testified that no one at the City has ever directed offensive, sexist, or racist remarks towards her or outside of her presence, and she has never head any statements suggesting an intent to discriminate against her. Doc. 25-1 at 29.  Logan has not presented evidence of "suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn," evidence of "systematically better treatment of similarly situated employees," or any evidence rending to show

that the City's reasons for any of its actions are a pretext for discrimination. *Lewis*, 934 F.3d at 1185.  Accordingly, her discrimination claim fails under the convincing mosaic standard.

## C.    Retaliation

Logan contends that the changes to her job duties were retaliation for her EEOC charge and complaint.[8] Doc. 1 at 4.  Title VII protects an employee from retaliation by her employer because she (a) opposed any practice prohibited by Title VII or (b) participated in any manner in an investigation, proceeding, or hearing under Title VII. *See* 42 U.S.C. § 2000e-3(a); *E.E.O.C. v. Total Sys. Servs., Inc*., 221 F.3d 1171, 1174 (11th Cir. 2000).  To establish a *prima facie* case of retaliation under Title VII, Logan must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal relationship between the two events. *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1363 (11th Cir. 2007).

Logan's retaliation claim fails for the same reason her discrimination claims fail—her work assignments were not adverse actions.  And even if they were, she cannot establish a causal connection between her work assignments and her protected activity.  To prove a causal connection, a plaintiff must show that "the

---

[8] Logan does not plead or argue that the insubordination and her resulting inability to supervise the white sergeants was retaliatory. *See* Docs. 1 & 30.

decisionmaker actually knew about the employee's protected expression," *Martin v. Fin. Asset Mgmt. Sys.*, 959 F.3d 1048, 1053 (11th Cir. 2020), and that "the protected activity and the adverse action were not wholly unrelated." *Shotz v. City of Plantation, Fla*., 344 F.3d 1161, 1180 n.30 (11th Cir. 2003).  This standard is met where there is "close temporal proximity" between the statutorily protected activity and the adverse action; however, absent other evidence of causation, the temporal proximity "must be very close." *Id*. (citation and quotation marks omitted).

Logan engaged in protected activity when she filed her EEOC charge on August 23, 2021, and again when she filed her complaint on December 6, 2021.[9] Logan's assignment to detective duties occurred in April 2022, four months after she filed her lawsuit and eight months after her EEOC charge.  In the Eleventh Circuit "a time interval of three to four months between the protected activity and termination is too attenuated, as a matter of law, to satisfy the causation element of a retaliation claim." *Hughes v. Wal-Mart Stores East LP*, 846 F. App'x 854, 858 (11th Cir. 2021) (citing *Thomas v. Cooper Lighting, Inc*., 506 F.3d 1361, 1364 (11th Cir. 2007).  Logan does not present any other evidence of causation, so her retaliation claim fails as a matter of law for this additional reason.

---

[9] There is no evidence that Logan engaged in protected activity before filing her EEOC charge. Even if Logan believed that the situation with Grace was discriminatory, there is no evidence that she reported that belief to Chief Bell, Mayor Richardson, or anyone else at the City.

## V.  CONCLUSION

For these reasons, the City of Midfield's Motion for Summary Judgment (Doc. 24) is due to be granted.  A final order will be entered.

DONE and ORDERED on April 24, 2023.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE